## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: | In Proceedings |
| | Under Chapter 7 |
| HASSAN A. ABRAHIM | |
| | Case No. 23-30475 |
| Debtor(s). | |
| | |
| FCB BANKS | |
| | |
| Plaintiff(s), | Adversary No. 23-3024 |
| | |
| v. | |
| | |
| HASSAN A. ABRAHIM | |
| | |
| Defendant(s). | |

## OPINION

This case comes before the Court after a trial on April 22, 2025 on Plaintiff FCB Banks'

First Amended Complaint objecting to Debtor Hassan Abrahim's discharge pursuant to 11 U.S.C.

§§ 727(a)(3), 727(a)(4) and 727(a)(5) and to the dischargeability of its debt pursuant to 11 U.S.C.

§§ 523(a)(2)(A) and 523(a)(2)(B).[1]

## FACTS

On October 1, 2015, Plaintiff FCB Banks ("Plaintiff") obtained a judgment against

Defendant Debtor Hassan Abrahim ("Debtor") in the Circuit Court of St. Clair County, Illinois. The

Memorandum of Revived Judgment entered November 14, 2022 evidenced a judgment of

---

[1] The Court notes that the Plaintiff also raised two new causes of action in its post-trial papers that were not pled in its Amended Complaint—one under 11 U.S.C.§ 727(a)(2)(A) and the other under 11 U.S.C. § 523(a)(6).

1

$1,125,384.05 (Plaintiff's Ex. A).  In an effort to collect its judgment, Plaintiff served the Debtor

with a Citation to Discover Assets ("Citation") on February 9, 2023, commanding him to appear on

March 20, 2023 for a citation hearing. (Plaintiff's Ex. P). The Citation was accompanied by an

Income and Property Statement ("Statement"), which required the Debtor to disclose his interests in

various forms of property, including any real estate, vehicles and bank accounts. Debtor's

completed Statement, which was signed under penalty of perjury, indicated that the Debtor owned

real property located at 501 Valley View Drive, Edwardsville, Illinois and a 2016 Ford pickup

truck.  No employment information or bank accounts were listed.  A citation hearing was conducted

on June 5, 2023 after being continued from its original March 20, 2023 date.  Shortly thereafter, on

July 17, 2023, the Debtor filed his Voluntary Petition under Chapter 7.

　　　　The Voluntary Petition, Schedules, and other forms were prepared on the Debtor's behalf by

his bankruptcy counsel, JD Graham PC.  Schedule A/B disclosed the Debtor's interests in the

following real property and vehicles:

(a)   A four-bedroom, four-bath single family home located at 501 Valley View Drive,
Edwardsville, Illinois.  The property was purchased in December 2021 for $315,000.00 and
Debtor valued it at $330,000.00 on his Schedule A/B.

(b)　A 2016 Ford F-350 pickup truck valued by the Debtor at $3,446.00.  The approximate
mileage as of the filing date was 393,477.  Debtor described the vehicle's condition as "fair"
and disclosed that although the Kelley Blue Book value of the vehicle was $10,446.00, it
had sustained an estimated $7,000.00 in body damage which decreased its value.

(c)　A 2010 Ford Explorer with mileage of approximately 300,000 miles.  Debtor listed the
Kelley Blue Book value of the vehicle as $2,789.00.

(d)　A 2010 Toyota Camry with approximate mileage of 295,000 and a Kelley Blue Book value
of $4,330.00. Debtor indicated that the vehicle was purchased by his daughter, Maura
Abrahim, and that he was listed on the title solely for registration and insurance purposes.

2

(e) A 2011 Ford Edge with approximate mileage of 299,000 and salvage value of $500.00. According to the Debtor, the vehicle was purchased by his daughter Eslam Abrahim, was unregistered, no longer operational, and located in off-street storage. The schedule indicated that Debtor was only listed on the title for insurance purposes.

*See* Plaintiff's Ex. I.

As to the Debtor's income and expenses, Debtor's Schedule I reflected that he was self-employed and earned net income of $1,192.33 per month from the operation of his business (Plaintiff's Ex. K). Schedule J reported that Debtor had monthly expenses of $5,449.96, resulting in a monthly deficit of $4,257.63 (Plaintiff's Ex. L). According to the Statement of Financial Affairs (SOFA), Debtor's gross income from the operation of his business from January 1, 2023 to the date of filing was $67,269.00. (Plaintiff's Exhibit N).

On October 23, 2023, Plaintiff filed its original *Complaint Objecting to Discharge of Debtor (727) and Objecting to Dischargeability of Debt (523)*. (ECF Doc.1). Count I of the Complaint requested denial of the Debtor's discharge "pursuant to 11 U.S.C. 727" alleging that Debtor had failed to "honestly and accurately" report his income and expenses prior to bankruptcy or list the correct value of his assets in his schedules. In Count II, Plaintiff requested that its debt be "deemed nondischargeable pursuant to 11 U.S.C. 523" due to Debtor making false statements under oath in in connection with the state court Citation proceeding, which prevented Plaintiff from obtaining payment of its debt.

In response, the Debtor moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action and requested a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). Due to the dearth of factual allegations in the Complaint and the Plaintiff's failure to plead the Complaint with the necessary specificity, the Court granted the Debtor's motion and Plaintiff was directed to file an Amended Complaint.

3

The instant *First Amended Complaint Objecting to Discharge of Debtor (727) and Objecting to Dischargeability of Debt (523)* ("Amended Complaint) was filed March 11, 2024. Count I requests that the Debtor's discharge be denied pursuant to 11 U.S.C. §§ 727(a)(3), (a)(4)(A), and (a)(5) due to his alleged failure to honestly and accurately report and/or explain his income and expenses prior to bankruptcy. Plaintiff also alleges under this Count that the Debtor's discharge should be denied for his failure to accurately value his assets on his schedules, particularly his residential real estate and vehicles. Count II prays that the debt owed to the Plaintiff be non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B) due to false statements that the Debtor made in conjunction with the state court citation proceeding which prevented the Plaintiff from obtaining payment of is debt. No reference was made in the Amended Complaint to either 11 U.S.C. § §727(a)(2) or 523(a)(6).

The Debtor filed his answer to the Amended Complaint on March 25, 2024. The trial on the Amended Complaint was conducted on April 22, 2025. At the conclusion of the evidence, the Court directed the parties to submit post-trial briefs in lieu of closing arguments and the matter was taken under advisement.

## <u>DISCUSSION</u>

The bankruptcy discharge is the mechanism by which debtors are provided a "fresh start" under the Bankruptcy Code. *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party objecting to the Debtor's discharge bears the burden of proof, FED. R. BANKR. P. 4005, and must establish the exception to discharge by a preponderance of the evidence. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966-67 (7th Cir. 1999). "The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor." *Soft Sheen Products, Inc. v. Johnson (In re Johnson)*, 98

4

B.R. 359, 367 (Bankr. N.D. Ill. 1998).  As such, objections to a debtor's discharge are construed strictly against the movant and liberally in favor of the debtor. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996); *In re Garcia*, 586 B.R. 909 (Bankr. N.D. Ill. 2018).

It is also important to note as a preliminary procedural matter that all objections to discharge and dischargeability sounding in fraud must be pled with particularity. FED. R. CIV. P. 9(b).  Federal Rule of Civil Procedure 9(b) made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7009 states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED R. CIV. P. 9(b).  "The circumstances of fraud or mistake include the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Fin. Servs*, 536 F.3d 663, 668 (7th Cir. 2008); *In re Carmell*, 424 B.R. 401, 412 (Bankr. N.D. Ill. 2010).  This heightened standard of pleading applies to all "averments of fraud," not merely to claims of fraud, so the application of Rule 9(b) will depend on the plaintiff's factual allegations. *Boresllino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir. 2007).

The purpose of Rule 9(b) is to "ensure that a defendant is appraised of the fraud claimed in a manner sufficient to permit the framing of an adequate response to the pleading." *United National Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 38 (N.D. Ill.1984).  Because of this, "[a] party that fails to raise a Rule 9(b) objection normally waives the requirement. *Id.* Courts have also found that waiver of the Rule 9(b) pleading requirements may be evidenced by the defendant's filing of an answer to the complaint.  *See HMBI v. Schwartz*, 2009 WL 2905535 at *4 (N.D. Ind., Sept. 8, 2009) (motion to dismiss based on Rule 9(b) "without merit" where defendant filed an answer denying

fraud allegations). Here, the Amended Complaint as pled cited four causes of action which are based in fraud: §§ 727(a)(3), 727(a)(4), 523(a)(2)(A), and 523(a)(2)(B).  While the Amended Complaint is minimalistic at best, by filing an answer the Defendant has waived any Rule 9(b) objections and the allegations under these sections are sufficient to satisfy the general pleading requirements of Federal Rule of Civil Procedure 8(a)(2), applicable which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2), applicable to bankruptcy proceedings pursuant to FED. R. BANK. R. 7008.

## SECTION 727(A)(3)—INADEQUATE RECORD KEEPING

The Plaintiff's first alleged basis for denial of the Debtor's discharge is § 727(a)(3).  This section provides, in pertinent part, that the Court shall deny a discharge where "the debtor has concealed, destroyed, mutilated or falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or  failure to act was justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).  The purpose of this section

> is to insure that dependable information [is] supplied to the trustee and creditors upon which they can rely in tracing the debtor's financial history; the trustee and creditors are entitled to complete and accurate information showing what property has passed through the debtor's hands during the period prior to bankruptcy.  The production of appropriate records is the *quid pro quo* for the debtor's relief from substantially all financial obligations through a discharge in bankruptcy.

*In re Ridley*, 115 B.R. 731, 734-35 (Bankr. D. Mass. 1990) (internal citations omitted).  A showing of intent by the debtor to conceal his financial condition is s not required under this section. *Razabonni v. Schifano (In re Schifano)*, 378 F.3d 60, 70 (1st Cir. 2004). All that is necessary is a showing that the debtor has unjustifiably failed to keep records of his financial condition.  *Meriden Bank v. Allen*, 958 F.2d 1226, 1234 (3rd Cir. 1992).

6

Here, although the Plaintiff cited § 727(a)(3) as grounds for relief, the Amended Complaint contains no allegations alleging that the Debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information" regarding his financial condition.  Further, this section was not addressed in either the Plaintiff's pre-trial papers or in its post-trial brief, nor was any evidence introduced at trial as to the sufficiency of the Debor's record keeping.  Therefore, the Court concludes that not only has this claim not been properly pled under either Rule 8 or Rule 9, it is also not supported by the evidence and, accordingly, no relief under § 727(a)(3) shall be granted.

### SECTION 727(A)(4)(A)—FALSE OATHS OR CLAIMS

The Plaintiff next alleges that the Debtor knowingly and fraudulently made false oaths and accounts on his bankruptcy schedules and Statement of Financial Affairs warranting a denial of his discharge pursuant to 11 U.S.C. § 727(a)(4)(A).[2]  In order to successfully prosecute a claim under this section, the movant must prove by a preponderance of the evidence that (1) the Debtor made a statement under oath; (2) the statement was false; (3) the Debtor knew that the statement was false; (4) the Debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.  *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011).  The purpose of this section is to "enforce the debtor's duty of disclosure and to ensure that the debtors provide reliable information to those who have an interest in the administration of the estate." *John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 880 (Bankr. N.D. Ill. 2004).

For purposes of Section 727(a)(4)(A), what constitutes a "statement under oath" is generally broadly construed. "A debtor's petition, schedules, statement of financial affairs, statements made at

---

[2] Section 727(a)(4)(A) provides: "The court shall grant the debtor a discharge, unless—the debtor knowingly and fraudulently, in or in connection with the case-- made a false oath or account."  11 U.S.C. 727(a)(4)(A).

a section 341 meeting, testimony given at a Bankruptcy Rule 2004 examination, and answers to interrogatories all constitute statements under oath." *Id.* Fraudulent intent may be established by showing that the debtor demonstrated a reckless disregard for the truth. *Spohn v. Carney (In re Carney)*, 558 B.R. 250, 260 (Bankr. N.D. Ill. 2016). "The cumulative effect of a number of false oaths by the debtor with respect to a variety of matters establishes a pattern of reckless and cavalier disregard for the truth by the debtor." *In re Stament*, 395 B.R. 59, 74 (Bankr. N.D. Ill. 2008). "Although not every single asset needs to be scheduled and valued, there comes a point when the aggregate errors and omissions cross the line past which a debtor's discharge should be denied." *Carney* at 260.

In its Amended Complaint, Plaintiff alleges that Debtor's discharge should be denied because the "schedules and statement of affairs filed in this case failed to honestly and accurately report and/or explain to the Court and creditors all of his income and expenses prior to bankruptcy." *Plaintiff's First Amended Complaint Objecting to Discharge of Debtor (727) and Objecting to Dischargeability of Debt (523)*, ECF. Doc. 20, ¶ 6. It also alleges that Debtor did not "accurately and honestly" list the value of his assets in his schedules, including the value that he placed on his residential real estate and "all vehicles." *Id.* at ¶ 7. At trial and in its post-trial brief (also referred to as Plaintiff's Closing Argument), the Plaintiff also asserted that Debtor failed to disclose his interest in a 2008 Toyota Prius on his Schedule A/B. *See* Plaintiff's Closing Argument, ECF Doc. 79, p. 4. The Court will examine each of these allegations separately.

### ***Failure to Honestly Value Real Estate***

The Plaintiff alleges that the Debtor's discharge should be denied pursuant to § 727(a)(4)(A) because he failed to honestly value his residential real estate on his bankruptcy schedules. Debtor

listed the value of the property at $330,000.00 on his Schedule A/B (Plaintiff's Ex. I).  Plaintiff

asserts that the actual value of the property is substantially higher, ranging anywhere from

$391,260.00 to $422,000.00 (*See* Plaintiff's Ex. F-H; DD).

Debtor credibly testified that he purchased the property on December 20, 2021,

approximately a year and a half prior to filing his bankruptcy petition.  The property was purchased

via a 1% down Veteran's Administration loan for $315,000.00.  Due to financial constraints, Debtor

has done no updates or repairs to the property since taking possession.  He testified that the home's

deck is rotting and unsafe and that the home has damaged and missing siding, damaged facie, and

peeling paint.  Debtor also testified that both the heating and air conditioning (HVAC) unit and the

roof are over twenty years old and in need of replacement.[3]  Further, Debtor testified that shortly

after taking possession of the property, he was required to make repairs to the home's concrete

driveway or face fines from the City of Edwardsville.  Debtor attempted to perform this work

himself.  However, the project remains only partially completed, resulting in one-half of the

driveway being unusable.  Debtor testified that he valued the property at $330,000.00 on his

schedules after considering all of these problems and the home's overall condition.

In support of its position, Plaintiff relies primarily on values provided by several popular

real estate websites.  Plaintiff's Senior Litigation Specialist, Barb Ashford, testified that internet

sites Redfin, Zestimate, and Realtor.com valued the property at $391,260.00, $399,000.00, and

$409,803.00 respectively.  The Plaintiff also introduced a Comparative Market Analysis (CMA)

prepared by realtor Kelly Etheridge on September 21, 2023, which concluded that the value of the

---

[3] Debtor could not say with certainty when the home was built, but he believed it was either 1994 or 2004.  He did testify, however, that both the HVAC system and roof were original to the house.

Debtor's property ranged from a low of $354,000.00 to a high of $422,500.00 based on comparable listings (Plaintiff's Ex. DD).  However, the Court finds that neither the website estimates nor the CMA are credible evidence to prove that the Debtor undervalued his residence on Schedule A/B.

At trial, the Court refused to allow the introduction of the website estimates as evidence of the property's value based on both hearsay and reliability concerns.  As the court noted in *In re Wilson*, 2022 WL 423401 at *3 (Bankr. C.D. Cal., September 13, 2022), "a Redfin estimate of value is not competent evidence of value since the identity and qualifications of the Redfin appraiser are unknown, and a valuation opinion of a competent real property professional or appraiser is preferred."  Similarly, courts have found Zillow "zestimates" to be "inherently unreliable."  *See also In re Phillips*, 491 B.R. 255, 260, n. 7 (Bankr. D. Nev. 2013), *quoting In re Darosa*, 442 B.R. 173 177 (Bankr. D. Mass. 2010).  This is because "Zillow is a participatory cite [sic], almost like Wikipedia.  Whereas Wikipedia allows anyone to input or change specific entries, Zillow allows homeowners to do so.   A homeowner with no technical skill beyond the ability to surf the web can log in to Zillow and add or subtract data that will change the value of his property.  This of course makes Zillow inherently unreliable."  *Darosa* at 177.

As to the CMA, the Debtor testified that the CMA was prepared at the request of his bankruptcy counsel and does not state a specific value for the property.  When the Trustee requested that a value be provided, Ms. Ethridge responded that considering the needed repairs, the property should sell for around $345,000,00, depending on market conditions (Debtor's Ex. 3).  In the CMA, Ms. Etheridge compared the Debtor's real estate to five other properties.  Notably, the CMA described the Debtor's property as a five-bedroom, four bath residence.  Debtor's undisputed testimony was that his home has only four bedrooms and 3.5 bathrooms.  Such a discrepancy would

certainly affect the property's value.  Further, Debtor testified that Ms. Ethridge did not actually

inspect the home and that the only real estate professional to do so was the  Trustee's realtor.[4]  The

Court notes that while Ms. Etheridge was disclosed on the Plaintiff's witness list and was present at

trial, she was not called to testify as to the conclusions in the CMA or as to how she reached her

ultimate conclusion that the property was worth approximately $345,000.00.  This leads the Court

to wonder how accurate her valuation was, since she was not called to testify.

Based on the evidence presented, the Plaintiff has not proven by a preponderance of the

evidence that the Debtor knowingly and fraudulently made a false oath when he valued his real

property at $330,000.00 on his Schedule A/B.  Debtor credibly explained how he arrived at the

scheduled value and the values tendered by the Plaintiff were either inadmissible into evidence or

were based on inaccurate information.  The property had only been purchased by the Debtor a year

and a half prior to filing for $315,000.00. A home that has been neither repaired nor maintained

over that period of time would likely not significantly appreciate in value, particularly to the extent

alleged by the Plaintiff.  The Court wonders whether the condition of the home at the time of

purchase was the reason that the Debtor was able to purchase it for $315,000.00 in the first place.

The Court finds that Debtor did not make a false oath on his Schedule A/B as to the value of his real

estate and, even if the Debtor's scheduled value was inaccurate, there was no showing that he

valued the property with a knowing intent to defraud his creditors.

### *Failure to Honestly Value Vehicles*

---

[4] Neither the Trustee's realtor nor Trustee Eggmann testified as to the results of the inspection.  Although, the Debor notes that shortly after the Trustee's realtor completed his inspection, Mr. Eggmann filed his Chapter 7 Trustee's Report of No Distribution.

In addition to the Debtor's real estate, the Plaintiff also contends that the Debtor significantly undervalued his vehicles in his bankruptcy schedules. Because the focus of Plaintiff's evidence at trial centered on the Debtor's 2016 F-350 pickup truck, the Court will address the value of that vehicle first.

As indicated *supra*, Debtor listed the Ford F-350 on his Schedule A/B as having a value of $3,446.00. The approximate mileage as of the filing date was listed as 393,477 and Debtor described the vehicle's condition as "fair." He also disclosed that although the Kelley Blue Book value of the vehicle was listed at $10,446.00, the truck had sustained an estimated $7,000.00 in body damage which decreased its value to the scheduled amount. *See* Debtor's Amended Schedule A/B, ECF Doc. 8.

The Plaintiff alleges that the Debtor has failed to honestly and accurately value this vehicle. Ms. Ashford testified on behalf of the Plaintiff that the JD Power trade-in value for a Ford F-350 pickup truck in average condition was $10,510.00, and that average price paid for a vehicle of this make and model was $18,430.00 (Plaintiff's Ex. B). Ms. Ashford was unsure when the report in question was printed and was unable to say whether the values in the report reflected the value of a Ford F-350 on the date that the Debtor filed his bankruptcy petition.[5] She explained that in determining the value of vehicles, she generally relied on the average condition price and did not take into consideration excessive mileage, body damage, or any other conditions that could adversely affect the value of a vehicle. Ms. Ashford also admitted that she had not personally inspected the truck at issue and was unaware of its condition.

---

[5] A notation on Exhibit B indicates that it was printed on February 21, 2024, which was approximately seven months after the Debtor filed his bankruptcy petition.

In addition to the testimony of Ms. Ashford, the Plaintiff also introduced the testimony of Darrin Compton of Community Broker Insurance Group regarding previous claims paid by Erie Insurance Company on the F-350. According to the testimony and accompanying exhibits, on December 23, 2022, Debtor received a claim payment equal to $13,165.85 after the F-350 was involved in an accident (this includes a $5,000.00 deductible, a $4,000.00 payment to the lienholder[6], and a $4,165.85 payment to the Debtor) (*See* Plaintiff's Ex. EE).  The Plaintiff maintains that the discrepancy between the amount paid on the insurance claim and the vehicle's scheduled value evidences that Debtor did not honestly value the vehicle since "[i]nsurance companies do not 'overpay' claims."  *Plaintiff's Post-Trial Brief*, ECF Doc. 79 at p. 5.

The Debtor disputes the values proffered by the Plaintiff and maintains that the scheduled value of the Ford F-350 accurately represented the vehicle's value at the time of filing.  According to the Debtor's testimony, an inspection of the Ford F-350 was performed at the Plaintiff's request shortly after the filing of the bankruptcy petition.  The Debtor took the truck to Maurice Auto Sales in Cahokia, Illinois for evaluation.  The report prepared by Mr. Maurice Alyatim, owner of Maurice Auto Sales, indicated that the value of the vehicle as of the October 10, 2023 inspection was $3,500.00.  The report listed the vehicle's mileage as 400,776, stated that the vehicle had sustained $9,000.00 in body damage, and described the vehicle as being in "poor general condition." (Debtor's Ex. 1). The report also noted that the truck needed engine repairs and that Mr. Alyatim would not be interested in purchasing it for his auto sales business. *Id.*

---

[6] The testimony regarding the lienholder payment was provided by the Debtor, not Mr. Compton.

Mr. Alyatim appeared and testified that he has been in the used car business since 2002. Although the Debtor has purchased several vehicles from Maurice Auto Sales, Mr. Alyatim testified that the Debtor is merely a customer and that the two are not friends. He explained that he utilized a dealer website, Auto Check, to arrive at the $3,500.00 value stated in his report.  This website permits auto dealers to input certain information such as a vehicle's vehicle identification number, mileage, and condition to determine the vehicle's current market value.  Mr. Alyatim testified that he believed that $3,500.00 represented an accurate "as is" value in light of the truck's condition and extremely high mileage.[7]

Consistent with the testimony of the insurance broker, Mr. Compton, the Debtor testified that the Ford F-350 has been involved in several accidents.  The first occurred pre-petition on December 23, 2022.  The value of the vehicle listed on Schedule A/B and in Mr. Alytaim's report reflected the damage from this incident.   The vehicle was subsequently involved in two post-petition accidents, one on January 22, 2024 and the other on April 14, 2024.  After the April 14, 2024 incident, the truck was ultimately totaled.   The Debtor acknowledged that in December 2022, his insurer paid a total claim of $13,165.85 on the truck.  However, Debtor testified that the insurance company paid the claim without inspecting the truck or considering its pre-existing condition or mileage.  Debtor's Post-Trial Brief, ECF Doc. 83 at p. 6.

---

[7] The testimony at trial revealed that the Ford F-350 was also inspected at the request of Trustee Robert Eggmann by Crossroads Auto Sales in Collinsville, Illinois. Neither the Trustee nor a representative of Crossroads appeared and testified as to the results of that evaluation. However, the Debtor testified that he was not contacted by the Trustee after Crossroad's inspection and the Trustee ultimately filed a "no asset" report in this case.

After considering the testimony of the witnesses and evidence presented, the Court cannot conclude that the Debtor knowingly and fraudulently undervalued the Ford F-350 pickup truck on his schedules. The Debtor's Schedule A/B disclosed that the scheduled value of the truck was based on its $10,446.00 Kelley Blue Book value, less a $7,000.00 deduction for body damage. Significantly, the only witness who actually inspected the subject vehicle testified that it was worth $3,500.00—which is within dollars of the $3,446.00 value stated by the Debtor on his schedules. The Court agrees that if the truck in question had been in even average condition with average mileage at the time of filing, the scheduled $3,446.00 value would be highly suspect. However, that is not the truck that we have in this case. *This* truck was characterized as being in fair condition with nearly 400,000 miles on it and an estimated $7,000.00 in body damage on the petition date. Based on this, the Court finds that the Debtor has not understated the value of this asset, nor exhibited any intent to do so.

In addition to the Ford F-350, the Debtor listed three other vehicles on his Schedule A/B: (1) a 2010 Ford Expedition; (2) a 2010 Toyota Camry; and (3) a 2011 Ford Edge (Plaintiff's Ex. I). As indicated previously, Debtor valued these vehicles at $2,789.00, $4,300.00, and $500.00 respectively on his schedules. Like the Ford F-350, Plaintiff alleges that the Debtor has knowingly and fraudulently undervalued each of these vehicles

Ms. Ashford testified on behalf of the Plaintiff that the JD Power average price paid for each of the remaining vehicles listed on Debtor's Schedule A/B were as follows: $5,815.00 for the 2010 Ford Expedition (Plaintiff's Ex. C); $5,310.00 for the 2010 Toyota Camry (Plaintiff's Ex. D); and $4,080.00 for the 2011 Ford Edge (Plaintiff's Ex. E). According to Ms. Ashford's testimony, none of these values took the vehicles' mileage or conditions into consideration and Ms. Ashford testified

15

that she had not inspected any of the vehicles. No other evidence was presented as to these vehicles'

values and the Plaintiff offered no testimony from anyone who had actually inspected or evaluated

these vehicles.

During his cross-examination of Ms. Ashford, Debtor's counsel pointed out that the JD

Power reports also include information regarding the trade-in values. According to the report, the

trade-in value for a 2010 Ford Expedition in average condition was $2,400.00 as of the report date.[8]

This figure is actually *less than* the $2,789.00 value scheduled by the Debtor.  Similarly, the trade-

in value for a 2010 Toyota Camry in average condition is listed in the JD Power report as

$2,260.00.  This, too, is less than the Debtor's scheduled value for this vehicle of $4,330.00.

As to the 2011 Ford Edge, both the Schedule A/B and the Debtor's testimony indicated that

this vehicle is no longer operational and is currently being stored in off-street storage. Because the

Edge was no longer in working condition, the Debtor placed a "salvage" value of $500.00 on it.

Ms. Ashford acknowledged that Plaintiff's JD Power report did not reflect "salvage" values.

However, the report does list the trade-in value of a 2011 Ford Edge in "rough" condition as

$655.00 (Plaintiff's Ex. E).  Ms. Ashford admitted that a salvage value would likely be less than a

rough condition value.

Given this evidence, the Court cannot find that the Debtor made false statements regarding

the value of these three vehicles. The Debtor's scheduled values reflected the Kelley Blue Book

values for each vehicle—he did not just "create" the values.  Two of the scheduled values—those

for the Expedition and the Camry-- actually *exceeded* the JD Power values for like vehicles in

---

8 Ms. Ashford testified that the Plaintiff generally uses the average condition price when determining a
vehicle's value.

average condition.[9,]  As to the Ford Edge, the Debtor disclosed on Schedule A/B that the vehicle

was no longer operational and he valued it accordingly.  Plaintiff offered no evidence as to the

vehicle's salvage value and its own witness admitted that such value was likely less than the

$655.00 "rough" condition price stated in the JD Power report   The Court concludes that there were

no knowingly false statements made by the Debtor with regard to the Ford Expedition, Toyota

Camry, or the Ford Edge and, accordingly, the Plaintiff's § 727(a)(4)(A) claims alleging that these

vehicles were undervalued too must fail.

### ***Undisclosed Vehicle***

In addition to alleging that the Debtor undervalued his vehicles on Schedule A/B, the

Plaintiff also asserted at trial that the Debtor should be denied a discharge pursuant to §

727(a)(4)(A) due to his failure to disclose his interest in a 2009 Toyota Prius.  In support of this

contention, the Plaintiff introduced copies of several cancelled checks drawn from the Debtor's

checking account in the amount of $500.00 each.  The checks were made payable to Maurice

Alyatim and each denoted that they were for payments on a Prius (Plaintiff's Ex AA).  The Plaintiff

asserts that the Debtor failed to disclose this vehicle on his Schedule A/B and, accordingly, should

be denied a discharge.

The Debtor testified that he does not own--nor has he ever owned --the Prius in question.

Debtor credibly testified that the vehicle belongs to Dr. Ahmd Radwan, a friend of the Debtor.

Because Mr. Alyatim did not personally know Dr. Radwan and had never done business with him,

Mr. Alyatim refused to accept installment payments from Dr. Radwan.  However, Mr. Alyatim was

---

[9] No evidence was presented suggesting that either the Expedition or the Camery were in better than average
condition as of the petition date, especially given that their combined mileage was reported as nearly 600,000 miles.

17

amenable to accepting payments from the Debtor on Dr. Radwan's behalf because of the Debtor's prior dealings with Mr. Alyatim and Maurice Auto Sales. Debtor testified that Dr. Radwan would give him cash for the Prius installment payments and the Debtor would, in turn, write checks for the payments to Mr. Alyatim. He further testified that he had no other involvement with the vehicle and only served as a middleman for payments. Debtor's testimony was bolstered by the fact that the vehicle was not titled in his name nor insured under his insurance policy.

Based on the testimony presented, the Court finds that the Debtor did not have an ownership interest in the 2009 Toyota Prius and, therefore, was under no obligation to disclose it on his bankruptcy schedules. The Debtor credibly explained why there were checks drawn from his account referencing the Prius. Plaintiff produced no evidence that the vehicle was titled in the Debtor's name and, notably, the Prius was not listed on Debtor's auto insurance declarations page (Plaintiff's Ex. V). A debtor cannot be found to have fraudulently failed to disclose an asset on his bankruptcy schedules in which he has no interest and there are no grounds for denial of the Debtor's discharge on this basis.

### *Undisclosed Income*

Plaintiff's final argument under § 727(a)(4)(A) is that Debtor's discharge should be denied due to his failure to honestly and accurately disclose his pre-petition income on Schedule I and his Statement of Financial Affairs (SOFA). Paragraph 4 of the Debtor's SOFA states that his gross income from January 1, 2023 through the date of filing was $67,269.00 (Plaintiff's Ex. N). Plaintiff alleges that this figure is inconsistent with account statements for the Debtor's business checking account for the same approximate period, which reflect deposits of $101,057.00 (Plaintiff's Ex. S). It also points to discrepancies between the gross income stated on the SOFA for calendar year 2021

18

and the Debtor's federal tax return.  Although Debtor's SOFA lists his 2021 gross income from the operation of his business as $60,515.00, his Form 1040, Schedule C reports gross receipts or sales for tax year 2021 of $84,515.00 (Plaintiff's Ex. X).

In addition to citing the income irregularities on the Debtor's SOFA, the Plaintiff also maintains that the income and/or expense figures stated on Debtor's Schedules I and J are inaccurate.  Schedule I lists Debtor's monthly income as $1,192.33 (Plaintiff's Ex. K).  Monthly expenses are stated as $5,449.96, leaving the Debtor "upside down" by $4,257.63 (Plaintiff's Ex. L).  Plaintiff contends that it would be impossible for the Debtor to maintain his lifestyle with such a significant monthly deficit and, therefore, "either the Debtor is lying about his income or is lying about his expenses."  Plaintiff's Closing Argument, ECF Doc. 79 at p. 4.

Debtor testified at trial that he provided his bankruptcy counsel with his bank statements, tax returns, and other financial documents and that counsel prepared the bankruptcy schedules and SOFA on his behalf. Debor did not personally "run the numbers" prior to signing the documents to ensure their accuracy but, rather, assumed that the scheduled information was correct.  Under questioning by Plaintiff's counsel regarding his income to expense ratio, Debtor admitted that he may have made a "mistake" on his Schedule J regarding his expenses, but did not elaborate as to which expenses may be incorrect. Debtor's testimony was clear, however, that his monthly expenses exceeded his income.

Similarly, under direct examination Debtor testified that like his bankruptcy schedules, his tax returns were prepared on his behalf by a tax professional.  He testified that he did not personally "crunch the numbers" but thought that the numbers in the returns were accurate.

As to the alleged discrepancies between the gross income figures stated on the SOFA and the Debtor's bank statements, the Debtor testified that he believed that the figures stated on the SOFA accurately represented his gross income from the operation of his business, USA Enterprises. Debtor is self-employed as a commercial handyman.  He explained that his business account statements reflect three types of deposits: (1) deposits into the business account which were then transferred into the Debtor's personal bank account; (2) deposits from customers for reimbursement for materials that the Debtor purchased and for which he was immediately reimbursed.  He did not run these through his business as income and expenses; and (3) deposits that represented reimbursements for business expenses that the Debtor did run through the business as business expenses.  *See* Defendant's Post-Trial Brief (ECF Doc. 83), p.1.  The Debtor maintains that Plaintiff's characterization of his gross income based solely on deposits into the business account fails to take into account Debtor's frequent transfers of funds from the business account to his personal account. The Debtor contends that the Plaintiff is "counting the same money twice or possibly three times as it transferred from his personal and business accounts."  *Id* at p. 2.

Based on the Debtor's testimony and evidence presented, it appears that the Schedule J and the SOFA may have contained some inaccuracies pertaining to the Debtor's income and expenses. While the Court finds the Debtor credibly testified as to the transfers in and out of his business account and that effect on his perceived gross income, the Debtor admitted that some of the expenses on Schedule J may have been misstated.  In addition, the Debtor's gross income for 2021 stated on the SOFA is significantly less than the income which is reflected on his 2021 tax returns. While the Court is concerned by these discrepancies, bankruptcy counsel's inaccurate calculations were of no consequence in this bankruptcy case. More accurate numbers would not have resulted in

20

the Debtor being in a Chapter 13 or have had any bearing on the Debtor's ability to repay his creditors. This leads the Court to believe that the false statements were not knowingly made. False statements in and of themselves are insufficient to establish a claim under § 727(a)(4)(A). The Plaintiff must still prove by a preponderance of the evidence that the Debtor's false statement was "knowingly and fraudulently" made "in or in connection with the case." The Plaintiff has failed to sustain this burden.

As indicated above, the Debtor testified that both his tax returns and bankruptcy documents were professionally prepared on his behalf using the financial information which the Debtor provided. While the Debtor did not double check the figures in any of the documents, he testified that he had no reason to believe that they were incorrect. Certainly, the ultimate responsibility for ensuring the accuracy of the bankruptcy schedules and other documents lies with Debtor, even if the documents were prepared by counsel   However, "[a] debtor will not be denied a discharge if a false statement is due to mere mistake or inadvertence," *In re Brown*, 108 F.3d 1290, 1294 (10th Cir. 1997), and honest errors and mere inaccuracies are not proper bases for denial of discharge, absent a showing of the requisite fraudulent intent. *Id.* at 1295.

Further, while there may have been mistakes on the Debtor's Schedule J regarding his expenses, the evidence was clear that the Debtor's income was insufficient to meet his monthly expenses. According to the Debtor's uncontroverted testimony, he is only capable of performing light jobs due to health concerns. This has affected the Debtor's business and he has applied for social security disability. The Debtor's mortgage lender obtained relief from the automatic stay in the bankruptcy proceeding due to the Debtor's failure to make his post-petition mortgage payments. Debtor testified that since the inception of his bankruptcy case in July 2023, he had made only three

payments on his mortgage loan and was facing foreclosure.[10] Debtor's testimony further indicated that he was not living lavishly,[11] that he had to rely on assistance from his children in order to make ends meet, and that he did not have the financial ability to maintain or repair his home.  Debtor's circumstances are not indicative of an individual with any surplus income, let alone the income alleged by the Plaintiff.[12]  Based on the foregoing, the Court cannot conclude that any misstatements as to the Debtor's income and expenses were knowingly and fraudulently made and, accordingly, Plaintiff's claim on these grounds is denied.

### SECTION 727(A)(5)—FAILURE TO EXPLAIN LOSS OF ASSETS

In addition to its claims under § 727(a)(4)(A), the Plaintiff also contends that the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(5).  Section 727(a)(5) provides that a debtor should be denied a discharge where he has "failed to explain satisfactorily. . . any loss of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).  "Section 727(a)(5) is broadly drawn and clearly gives a court broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets."  *First Federated Life Ins. V. Martin (In re Martin)*, 698 F.2d 883, 886 (7th Cir. 1983).  Under this section, the objector bears the initial burden of going forward with evidence that the

---

[10] According to the Debtor's testimony, the three payments had only been recently made as part of a trial forbearance agreement with his mortgage lender.

[11] The Court notes that the Plaintiff makes repeated allegations that the Debtor paid thousands of dollars for his daughter's wedding shortly after filing his bankruptcy petition.  *See* Plaintiff's Post-Trial Brief, ECF Doc. 79 at p. 4. Plaintiff provided absolutely *no* evidence to substantiate this claim.  The Debtor's unrefuted testimony was that wedding expenses in his culture are covered by the groom and that the only thing that he paid for was a small family gathering in his home.

[12] At page 4 of his post-trial brief, Plaintiff's counsel poses a number of questions regarding the disparity between the Debtor's income and expenses such as "How does he survive? How does he keep his house payment current? How does he eat? How does he pay insurance? How does he pay for fuel and other expenses?"  Based on the testimony, the answer to these questions, quite simply, is *he didn't*.

debtor has failed to explain losses.  "Once the objector has introduced some evidence of the disappearance of substantial assets or of unusual transactions, the debtor must satisfactorily explain what happened."  6 COLLIER ON BANKRUPTCY, ¶ 727.08 (16ᵗʰ ed. 2022). *See also Martin* at 886.

The burdens of proof under §727(a)(5) have been summarized as follows:

> The plaintiff has the initial burden of identifying the assets in question by appropriate allegations in the complaint and showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors. . . . Once the creditor has introduced some evidence of the disappearance of substantial assets, the burden shifts to the Debtor to explain satisfactorily the losses or deficiencies.

*Ehle v. Brien (In re Brien)*, 208 B.R. 255, 258 (1ˢᵗ Cir. BAP 1999), quoting *In re Potter*, 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988).  *See also In re Manevska*, 587 B.R. 517, 539 (Bankr. N.D. Ill. 2018); *Structured Asset Services, LLC v. Self (In re Self),* 325 B.R. 224, 250 (Bankr. N.D. Ill. 2005). Although § 727(a)(5) does not require the allegations to be pled with specificity under Rule 9, the plaintiff is still required to identify the particular assets that have been lost.  *Brien* at 258.  *See also Riumbau v. Colodner (In re Colodner)*, 147 B.R.90, 94 (Bankr. S.D.N.Y 1992) ("creditor must allege and prove that the debtor no longer has assets which the debtor previously owned and that the debtor has failed to explain the loss."); 6 COLLIER ON BANKRUPTCY, ¶ 727.08 (16ᵗʰ Ed. 2022) (§ 727(a)(5) does not require pleading with particularity, but "the plaintiff must still identify particular assets that have been lost.").

Plaintiff's Amended Complaint is pled in two counts.  Count I lists the Plaintiff's alleged bases for denial of the Debtor's discharge; Count II alleges Plaintiff's grounds for non-dischargeability of its debt.  The Amended Complaint does not specify which of Plaintiff's allegations relate to which of its listed causes of action, essentially leaving the Debtor (and the Court) to guess. From the Plaintiff's post-trial papers, it appears that its § 727(a)(5) claim is based

on Paragraph 6 of the Amended Complaint, which seeks denial of the Debtor's discharge because "the schedules and statement of financial affairs filed in this case failed to honestly and accurately report and/or explain to the Court and creditors all of his income and expenses prior to bankruptcy." Amended Complaint, Doc. 20, ¶ 6.  This allegation fails to plead that the Debtor previously owned assets, fails to specifically identify said assets, and fails to plead that said assets have been lost and are no longer available for Debtor's creditors.  In fact, the Amended Complaint does not allege a "loss" at all.  It does "not constitute a prima facie case under section 727(a)(5) to merely make an allegation of a failure to explain loss or deficiency of assets." *First Federated Life Insurance Co. v. Martin (In re Martin)*, 698 F.2d 833, 886 (7th Cir. 1983).[13]  Based on the foregoing, the Court concludes that the Plaintiff has failed to satisfy its burden of proving its alleged § 727(a)(5) claim in the Amended Complaint and no relief on these grounds shall be granted.  *See e.g. Premier Capital LLC v. Crawford*, 275 B.R.275, 209 (Bankr. D. Mass 2015) (after three-day trial, relief on § 727(a)(5) claim denied where objector's complaint failed to identify the assets in question and merely alleged that the debtor had "failed to explain satisfactorily the loss of his assets and or the deficiency of his assets to meet his liabilities").

## SECTION 523(A)(2)(A)—DEBTS OBTAINED BY FALSE PRETENSES, FALSE REPRESENTATIONS AND ACTUAL FRAUD

---

[13] Proper pleading is imperative under § 727(a)(5) in order to provide debtors with sufficient notice of the claims against them. Unlike other § 727 exceptions to discharge which place the burden of proof solely on the Plaintiff, the burden under § 727(a)(5) is a shifting one.  Once Plaintiff establishes its *prima facie* case, the Debtor is obligated to provide a satisfactory explanation for the loss of assets.  *In re Mantra*, 314 B.R. 723, 730 (Bankr. N.D. Ill. 2004).  In order to be deemed "satisfactory," the debtor's explanation must meet two criteria: (1) it must be substantiated by some documentation; and (2) the documentation must be sufficient to "eliminate the need for the Court to speculate as to what happened to all the assets." *Id.* quoting *In re Bryson*, 187 B.R. 939, 956 (Bankr. N.D. Ill. 1995).  Unless the Plaintiff properly establishes its claim, the Debtor will be prejudiced in his defense at trial.

In addition to its objections to discharge, the Plaintiff also alleges that its debt should be deemed non-dischargeable pursuant to both 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B).  These sections provide, in pertinent part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
>> (2)  for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—
>>> (A)  false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>>> (B)  use of a statement in writing—
>>>> (i) that is materially false;
>>>> (ii) respecting the debtor's or an insider's financial condition;
>>>> (iii) on which to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>> (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C § 523(a)(2)(A), (B).

Although, the Plaintiff seeks relief under both subsections (A) and (B), the language of the statute makes clear that these provisions are applicable in different situations. As the court explained in *In re Sharp*, 561 B.R. 673, 679 (Bankr. N.D. Ill. 2016):

> Both exceptions are based on fraud and have some elements in common, but they are by no means the same.  The critical difference…is that a false written statement of the debtor's 'financial condition' will support an exception to discharge *only* under section 523(a)(2)(B).  Section 523(a)(2)(A) not only does not apply to statements of that kind but specifically excludes them:  it applies to statements 'other than a statement respecting the debtor's . . .financial condition.' 11 U.S.C. § 523(a)(2)(A). In short, the two exceptions are 'mutually exclusive.' *Minnesota Dept. of Empl't & Economic Development v. Sanderson (In re Sanderson)*, 509 B.R. 206, 209 (Bankr. W.D. Wis. 2014); *Rutili v. O'Neill (In re O'Neill)*, 468 B.R. 308, 343 (Bankr. N.D. Ill. 2012).

*Id. (emphasis added)*.  Here, the Plaintiff's claims under § 523(a)(2) are based on a *written* Income and Property Statement that the Debtor provided in conjunction with the state court citation

proceeding.[14] The Court finds that this Income and Property Statement constitutes a "statement respecting the debtor's financial condition" and, therefore, is expressly excluded from the application of § 523(a)(2)(A). Accordingly, relief under that exception to discharge is denied.

Further, both § 523(a)(2)(A) and (B) except from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit to the extent *"obtained by "* a debtor's misstatements. The phrase "obtained by" traditionally has referred to those debts "resulting from" or "traceable to" a debtor's misstatements or fraud. *Field v. Mans*, 516 U.S. 59, 61, 64, 66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The debt in the instant case was not "obtained by" Debtor's alleged misstatements. Rather, the alleged misstatements were made in the course of Plaintiff's subsequent collection efforts. Therefore, § 523(b)(2)(B) is inapplicable and this claim, too, is denied.

## Unpled Claims—11 U.S.C. § 727(a)(2)(A) and 11 U.S.C. § 523(a)(6)

In its post-trial brief, the Plaintiff asserts two additional claims that were not pled in its Amended Complaint-- one under 11 U.S.C. § 727(a)(2)(A) and the other under 11 U.S.C. § 523(a)(6). Section 727(a)(2)(A) denies a discharge to a debtor who transfers property with the intent to hinder creditors within a year of filing bankruptcy,[15] while Section 523(a)(6) excludes from

---

[14] Paragraph 9 the Amended Complaint states:
FCB held a Citation to Discover Assets against the Debtor at which time the Debtor stated under oath in his Income and Property Statement that he provided to [Plaintiff] as compliance with the Citation to Discover Assets that he only owned a house and one vehicle; that he had no employment or income; and that he had no bank accounts. The Debtor's lies prevented [Plaintiff] from obtaining payment of its debt.

Amended Complaint, ECF Doc. 20, ¶ 9.

[15] Section 727(a)(2)(A) provides that a discharge shall not enter "where the debtor, with the intent to hinder, delay a creditor. . . has transferred . . . property of the debtor within one year before the date of the filing of the petition. . .. . 11 U.S.C. § 727(a)(2)(A).

26

discharge any debts for "willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  For the reasons stated below, no relief shall be granted on either of these claims.

Post-trial amendments to complaints are addressed in Federal Rule of Civil Procedure 15(b), made applicable to bankruptcy adversary proceedings by Federal Rule of Bankruptcy Procedure 7015.  Rule 15(b)(2) states:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move—at any time, even after judgment—to amend the pleading to conform them to the evidence and to raise an unpled issue.  But failure to amend does not affect the result of the trial on that issue.

FED. R. CIV. P. 15(b).  Amendment under Rule 15(b)(2) does not require a motion, and "a court may enter judgment on an unpleaded claim even without a formal amendment to the pleadings so long as the parties expressly or impliedly consented to trial on the issue." *In re May*, 579 B.R. 568, 582 (Bankr. D. Utah 2017), quoting *In re Gunsteen*, 487 B.R. 887, 903 (Bankr. N.D. Ill. 2013).

In the Seventh Circuit, the test for express or implied consent under Rule 15(b)(2) is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known the substance of the amendment."  *Matter of Prescott*, 805 F.2d 719, 725 (7th Cir. 1986). Indications of implicit consent include when an issue outside the pleadings is presented and argued without proper objection by opposing counsel, and when the opposing party itself presents evidence on the matter. *Id.*  However, a court "will not imply a party's consent to try an unpleaded claim 'merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim.'"  *Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013) (quoting *Ippolito v. WNS, Inc.*, 864 F.2d 440, 456 (7th Cir. 1988)).  Further, although Rule 15(b)(2)

is to be liberally construed, "the Court must protect the due process rights of the opposing party and therefore may allow a late amendment only if the non-moving party will not suffer undue prejudice." *In re Fautz*, 636 B.R. 553, 562 (Bankr. D. Mass. 2022).

### Section 727(a)(2)(A) Claim

In its post-trial brief, Plaintiff asserts that the Debtor's discharge should be denied pursuant to § 727(a)(2)(A) because the Debtor transferred funds from his bank accounts in violation of the Bank's citation lien with the intent to hinder and delay creditors.  Plaintiff's Closing Argument, ECF Doc. 79, p. 1.  The Amended Complaint does not reference § 727(a)(2)(A) in any way, nor does it make any allegations regarding transfers from the Debtor's bank account in violation of the state court citation.  The citation proceeding was only referenced in the context of Plaintiff's claims for non-dischargeability of debt under § 523.  Also, at trial, Plaintiff's counsel made no indication in his opening statement that the Plaintiff was now asserting a claim under § 727(a)(2)(A) due to an alleged violation of the citation to discover assets.[16]  Despite this, however, Debtor's counsel did not expressly object to the introduction of this unpled claim in his post-trial brief and, therefore, is deemed to have implicitly consented to the amendment.  *Fustolo v. Patriot Grp., LLC (In re Fustolo)*, 896 F.3d 76, 84 (1st Cir. 2018).

The Plaintiff argues in its post-trial Closing Argument that a citation to discover assets was issued to the Defendant on February 9, 2023 (Plaintiff's Ex. P), which, under Illinois law, created a lien in favor of the Plaintiff on all of the Debtor's property.  735 ILCS 5/2-1402(m)(1).  It also argues that the after being served with the citation, the Debtor was prohibited from making any

---

16 The Court notes that the Plaintiff did raise a § 727(a)(2)(A) argument in its Findings of Fact and Conclusions of Law filed March 16, 2025.  ECF Doc. 50 at p. 2, ¶ 4.

transfers from his bank account absent court approval. *City of Chicago v. Air Auto Leasing Co.*, 297 Ill. App. 3d 873, 697 N.E.2d 788, 232 Ill. Dec. 46 (1ˢᵗ Cir. 1998). Despite this, the Plaintiff alleges that the Debtor continued to write checks and make transfers from his bank accounts in violation of the citation until he filed his bankruptcy petition on July 17, 2023. Plaintiff asserts that these transfers were done with the intent to hinder and delay Plaintiff's collection efforts and, therefore, Debtor's discharge should be denied.

In support of its position, the Plaintiff cites *In re Cannell*, 2013 WL 2467787 (Bankr. C.D. Ill. June 7, 2013), in which a debtor who made unauthorized transfers from his bank accounts after being served with a citation to discover assets was denied a discharge under § 727(a)(2)(4). In *Cannell*, the debtor—a practicing attorney—was served with a citation to discover assets which contained language expressly prohibiting the transfer of any non-exempt assets.[17] Despite this, the debtor continued to transfer funds to his personal and business account (which was also subject to a citation) to his wife's account. He also closed a bank account due to concerns that it would be frozen and he would be prevented from paying his child support, *Id. at *2.* The debtor subsequently filed a Chapter 7 petition, and the citation creditor brought an adversary proceeding for denial of the debtor's discharge under § 727(a)(2)(A).

---

[17] The citation in *Cannell* stated:

YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which he may be entitled or which may be acquired by or become due to him and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to him, until the further order of court or termination of the proceedings.

*Cannell* at *1.

Although the court noted that transfers for ordinary living expenses would not ordinarily be considered to have been made "with the intent to hinder, delay, or defraud" creditors, the fact that the transfers had been made after the debtor had been served with a citation to discover assets complicated matters.  In discussing Illinois citation law, Judge Gorman explained:

> When a judgment creditor properly serves a judgment debtor with a citation, a lien for the judgment or the balance due on the judgment instantaneously attaches to the debtor's non-exempt personal property.  *See* 735 ILCS 5/2-1402(m).  Not only does the lien attach to all nonexempt personal property then in the judgment debtor's possession and control, but also to all such property that the debtor later acquires or that comes due to him, up to the point of the citation's disposition.  735 5/2-1402(m)(1).  The lien attaches to tangible and intangible property. *See* 735 ILCS 5/2-1402(m); *Taylor v. Millikin Nat'l Bank (In re Dean).*  80 B.R.932, 934 (Bankr. C.D. Ill. 1987).  The lien is also perfected immediately upon service of the citation.  *See Cacok v. Covington*, 111 F.3d.52, 54 (7th Cir.); *West Bend Mut. Ins. Co. v. Belmont State Corp*., 2010 WL 5419061 at *6 (N.D. Ill. Dec. 23, 2010).

> * * *

> When a judgment debtor or a third party is served with a citation, that person or entity generally is prohibited from making or allowing a transfer or disposition of the judgment debtor's nonexempt personal property.  *See* 735 ILCS 5/12-1402(f)(1).  The citation respondent must thus hold the judgment debtor's property in status quo until the judgment creditor's rights can be determined.  *Bank of Aspen v. Fox Cartage, Inc.*, 490 N.E.2d 145, 148 (Ill. App. Ct. 1986); *Vendo Co. v. Stoner*, 438 N.E.2d 933, 938 (Ill. App. 1982).  Notwithstanding these strictures, a judgment debtor has the right to assert exemptions against certain income or assets at the citation hearing, or to seek a declaration at an earlier date by submitting a written request to the Clerk of the Court.  *See* 735 ILCS 5/2-1402(b), (j) (l); *In re Mayer*, 388 B.R. 869, 873-74 (Bankr. N.D. Ill. 2008)….Failure to obey a citation opens the citation respondent to punishment for contempt.  Ill. Sup. Ct. R. 277(b).

*Id*. at *4.

In *Cannell*, the court ultimately denied the debtor's discharge.  The debtor admitted that he knew that he was prohibited from transferring funds subject to the citation and that he never obtained state court approval to do so.  He also admitted that he began transferring money into an account in his wife's name to avoid it being frozen and even closed a bank account to avoid the

creditor's collection efforts. Therefore, the court's "inescapable conclusion" from the debtor's testimony was that "transferring the funds in violation of the citation was done with the express intent to hinder and delay the collection efforts of the Bank." *Id. at* \*5.

Here, as in *Cannell*, the evidence before the Court showed that a citation to discover assets was served on the Debtor and that the Debtor continued to make transfers from his bank accounts after the service of the citation. However, that is where the similarities between the two cases ends. Unlike the citation in *Cannell*, the citation in this case did **not** include language prohibiting the Debtor from transferring assets subject to the citation. *See* Plaintiff's Ex. P.[18] Section 5/2-1402(f) of the Illinois Code of Civil Procedure provides that "[t]he citation *may* prohibit the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment therefrom…." The statutory language is *permissive* and the citation in this case contained no such prohibition. *See Cannell* at \*3, n. 3 (noting that § 5/2-1402(f) was permissive). Further, there was absolutely no testimony that the Debtor knew that his bank accounts were subject to a lien. The only testimony before the Court was that the Debtor transferred funds from and between his bank accounts in the operation of his business and for the payment of his living expenses—something he was permitted to do absent a prohibition in the citation. The Debtor made no transfers to non-debtor accounts in attempt to hide assets. Accordingly, the Court cannot conclude that the Debtor's post-citation transfers were made

---

[18] In addition to providing instructions to the debtor as to how to complete the form and advising the debtor that making knowingly false statements on the form was perjury, a Class 3 felony, the citation included "Notice to Debtor" which advised the debtor that failure to attend the scheduled court date may result in the issuance of a rule to show cause requiring a court appearance. It then explained a rule to show cause and the potential consequences of not attending a show cause hearing. No transfer prohibition pursuant to ILCS 5/2-102(f) was included.

31

with the "intent to hinder, delay, or defraud a creditor" and, therefore, Plaintiff's § 727(a)(4)(A) claim is denied.

## Section 523(a)(6) Claim

In its post-trial Closing Argument, the Plaintiff contends that it is entitled to relief under 11 U.S.C. § 523(a)(6) because the evidence at trial showed "that it was substantially certain that the Debtor's actions of lying under oath at his Citation and failing to disclose assets were certain to result in harm to FCB." Plaintiff's Closing Argument, ECF Doc. 79, p. 12. Although the Amended Complaint makes no reference to § 523(a)(6), Plaintiff asserts that this claim was properly pled because Plaintiff "clearly asserted in its complaint that the Defendant lied under oath in the state court collection action." Plaintiff's Reply Argument (ECF Doc. 84), p. 3. The Court disagrees.

Admittedly, the general pleading standard under Rule 8 of the Federal Rules of Civil Procedure does not require that a complaint set forth specific legal theories. *Johnson v. Shelby*, 574 U.S. 10, 135 S.Ct 346, 190 L.Ed.2d 309 (2014). The Seventh Circuit has interpreted *Johnson* to allow plaintiffs to invoke unpled legal theories for the first time in response to dispositive motions, including motions for summary judgment, explaining that "[c]omplaints plead *grievances*, not legal theories . . .. What rule of law, if any, those acts violated, [is] a subject to be explored in other papers, such as motions, memoranda and briefs." *Koger v. Dart*, 950 F.3d 971, 975 (7th Cir. 2020) (emphasis in original) (plaintiff permitted to raise unpled due process claim in defense of motion for summary judgment). There is a difference, however, between invoking new claims at the summary judgment stage of pre-trial litigation and raising new causes of action after the trial has been concluded. In the instant case, the Plaintiff had *numerous* opportunities to raise a § 523(a)(6) claim

32

in its various pre-trial pleadings or even at trial but did not do so.  Instead, it chose to wait to raise the claim in its post-trial brief after the close of evidence.

Section 523(a)(6) excepts from discharge for "willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6). A willful and malicious injury under § 523(a)(6) requires proof of a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed. 2d 90 (1998).  In order to satisfy this standard, the plaintiff must show either that the debtor had a subjective motive to inflict the alleged injury or that the debtor believed that the injury was substantially certain to occur as a result of his conduct.  *In re Su*, 290 F.3d 1140, 1143 (9th Cir. 2002).  The Amended Complaint in this case is totally devoid of any facts or allegations regarding the Debtor's intent.  Further, Count II of the Amended Complaint *specifically* sought relief *only* under §§ 523(a)(2)(A) and (B) of the Bankruptcy Code. Despite the Plaintiff's assertions to the contrary, the Court does not believe that the Plaintiff properly pled a claim under § 523(a)(6) in its Amended Complaint and, therefore, Rule 15(b)(2) applies.

From its post-trial brief, it is clear that the Defendant does not expressly consent to a post-trial amendment to include a § 523(a)(6) claim.  Nor can the Court find that any such consent was implied.  The evidence that the Plaintiff presented in support of it claims under § 523(a)(2) (*i.e.*, that the Debtor "lied" to the state court in his citation proceeding), is the same allegation—and evidence-- upon which the Plaintiff now seeks to rely for its § 523(a)(6) claim.  As the court explained in *In re Tabor*, 637 B.R. 732 (Bankr. S.D. Fla. 2022):

> If evidence is presented at trial without objection, and that evidence supports a new theory for relief not addressed in the complaint, the complaint may be amended to reflect the new theory for relief because the defendant is deemed to have consented. *But if the evidence presented at trial was relevant to any theory already presented in*

33

*the complaint, it would be unfair to deem the failure to object a consent because the defendant would have no reason to object to evidence relevant to a claim presented in the complaint. In such an instance, the complaint will not be deemed amended to add the new theory for relief*

*Id*. at 749 (emphasis added). Accordingly, this Court finds that Debtor neither expressly nor implicitly consented to try a claim under § 523(a)(6) and Plaintiff's request for relief on these grounds is denied. Further, even if pled, the evidence at trial was insufficient to support a § 523(a)(6) claim, as no intent was proven or implied.

## CONCLUSION

Based on the foregoing, the Court concludes that the Plaintiff has failed to sustain its burden of proof on its claims seeking denial of the Debtor's discharge under 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4)(A) or for a determination of non-dischargeability of its debt pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B). Further, the Court finds that the Plaintiff failed to properly plead its claims under 11 U.S.C. §§ 727(a)(3), 727(a)(5) and 523(a)(6). As such, all relief requested by the Plaintiff in the Amended Complaint and in its post-trial brief is denied.

A separate order shall enter.

ENTERED: September 26, 2025

/s/ Laura K. Grandy
_____
UNITED STATES BANKRUPTCY JUDGE

34